VERNA MOORE, RESPONDENT, v. CONNECTICUT FIRE INSURANCE COMPANY, A CORPORATION, APPELLANT.—181 S. W. (2d) 176.

Kansas City Court of Appeals. May 8, 1944.

*Roy W. Rucker* for appellant.

*John J. Robinson* and *Calvin & Kimbrell* for respondent.

CAVE, J.—This is an appeal from a judgment of the Circuit Court of Grundy County in favor of plaintiff. The suit is on a theft insurance policy. The petition is conventional.

The answer admitted the issuance of the policy, the loss to plaintiff, the furnishing of proof of loss; but alleged that plaintiff had misrepresented in the proof of loss that she had paid $1800 for the coat in March, 1939, when in truth and fact she purchased it on April 10, 1937, for the sum of $1200; that the value of the coat was less than $1500; that defendant had not refused to pay the actual cash value of the coat but had refused to pay the full amount; that the actual cash value was from $500 to $1000; the policy provided for three per cent per month reduction of the principal for each month the coat was out of storage. Defendant offered to permit judgment be taken for $1000. The reply was a general denial.

The verdict was for $1300 damages, $75 for vexatious refusal to pay, and $250 attorney's fee. Judgment rendered accordingly.

The errors charged are: (a) In submitting to the jury the issue of vexatious delay and attorney's fee "in the absence of any demand for a specific sum prior to the filing of suit"; (b) the verdict is grossly excessive; (c) in refusing to permit cross examination of plaintiff with reference to her association with certain "police characters."

With reference to alleged error (a), the record discloses that on the next day after the robbery an agent of defendant called on plaintiff and got a detailed written report, signed by her, giving all the information she had concerning the robbery, where she had purchased the coat, what she had paid for it, and her opinion that the value was in excess of $1800. She testified that after giving the agent such report she called him by telephone on an average of once each week for the next three months and inquired if he had any report to make or any information for her regarding the coat and each time he informed her that "they was still investigating." After about three months of such inquiries and answers, she went to the office of a Mr. Hoth, an adjuster for defendant, and asked if he had anything definite for her

and he said he did not. "I said I thought I had waited quite some-time now; that at least three months or more had elapsed; and that my attorney told me to come up and get a yes or no answer, that I was entitled to that." When informed that she had consulted an attorney, the adjuster stated, . . . "you wouldn't dare sue us; we are still investigating for you. . . . If you have an attorney, go ahead and sue." She didn't demand any specific sum of money because "we never got to that", but she considered the adjuster had refused to do anything about the matter and filed suit shortly there-after.

The adjuster testified that she came to his office on June 9, 1942 (three months after the robbery), and he sought to adjust the claim "on behalf of the insurance company, and I asked her what her ideas were, she said she wanted $1500. . . . I told her that under no circumstances could the company pay $1500, and she said she had consulted an attorney who told her she could recover that much, and I told her that I didn't believe she could recover that much, and she said, 'well, there is no use talking any further then.' She left." "Q. So you are telling us now that after that conversation in which Mrs. Moore stated to you that she expected $1500 for the loss of her coat, that you told her the company would not pay that amount of money, but was willing to adjust the loss on the proper basis? A. I told her she couldn't collect the money, but the company was willing to adjust it on the proper basis."

Appellant relies upon the case of Goldbaum v. Great Eastern Casualty Company, 222 S. W. 868, wherein the court said, l. c. 870: "Plaintiff, nowhere in his testimony states that he made any demand for the payment of this loss, or, if made, what amount he demanded, nor is there anything in the record, aside from the pleading, to show a refusal of the company to pay. Therefore, we think it was error to submit to the jury the question of defendant's liability for vexatious delay and attorney's fee." The facts in this case do not bring it within that rule because, in her proof of loss, she placed the value of the coat in excess of the face of the policy; for three months thereafter she called defendant's agent on an average of once a week, requesting information, and the only report she got was "they were still investi-gating"; when she went to the chief adjuster's office and, among other things, informed him that she had consulted an attorney, he told her "to go ahead and sue. . . . I told her she couldn't collect the money, but the company was willing to adjust it on the proper basis." It has been held that the refusal to pay insurance without giving a reason, constitutes evidence of vexatiousness. [Jabin v. National Accident Insurance Company, 226 Mo. App. 342, 41 S. W. (2d) 874.] In Friedman v. State Mutual Insurance Company, 108 S. W. (2d) 156, l. c. 164, this court said:

"Direct and positive evidence to the effect that the delay in payment was vexatious is not required; that such delay was vexatious may be shown from the circumstances in the record. [Coscarella v. Metropolitan Life Insurance Co., 175 Mo. App. 130, 157 S. W. 873.]

"In determining the question of vexatious delay, the court had the right to take into consideration the validity of the plaintiff's claim and the fact that it became necessary to institute a suit to collect them. Where such claims are valid, the fact that the defendant declines to pay without litigation is of itself evidence tending to show the delay thereafter to be vexatious. It is charged with a knowledge of the law. Such is the established rule of the decisions. [Rice v. Provident Life & Accident Ins. Co. (Mo. App.), 102 S. W. 147; Keller v. Home Life Ins. Co., 198 Mo. App. 440, 95 S. W. 903; Cox v. Kansas City Life Ins. Co., 154 Mo. App. 464, 135 S. W. 1013; Williams v. St. Louis Life Ins. Co., 189 Mo. 87 S. W. 499.]"

We think there is sufficient evidence in this record to authorize the submission of such issues to the jury. This point is ruled against defendant.

It is next contended that the court erred in refusing to set aside the verdict because it is grossly excessive. The policy insured against loss or damage to the extent of "the actual cash value of the property at the time any loss or damage occurred; . . . but . . . liability shall not exceed the above amount of insurance ($1500) less depreciation . . . at the rate of three (3%) per cent . . . excluding the time said garments are in the custody of any fur storer for storage."

Plaintiff, who had been engaged in the business of buying and selling furs of this kind and character for about seven years, testified that at the time of the theft the coat was worth $1500, although she paid only $1200 for it on sale. She said it had originally been priced to her at $1800.

Mr. Gerhardt, who had been in the fur business in Kansas City for twenty-five years and was a fur manufacturer and also stored furs, testified that he was familiar with this particular fur coat; that it had been stored at his place of business from April 21st to November 6, 1941; that he examined the coat and appraised its value for the insurance company and found it "in perfect shape, no sign of wear on the coat. It was several years old, but it was worn very little. One year it was in storage the whole winter; she didn't take it out at all; she wore it very little." He said there were many grades and types of mink coats and that they varied in price from $800 to $8000; that when this coat left his storage plant on November 6, 1941, "it was worth every bit of $1500." On cross-examination he testified that if plaintiff undertook to sell the coat for cash and could find a buyer, she would do well to sell it for $1000 cash. We do not think this destroys his testimony to the effect that the cash value of the coat

was $1500 because the market value of a fur coat is not set by some one individual seeking a buyer for his or her fur coat, but rather by fur dealers. This is not a commodity which is usually sold in trade between individuals, like livestock, but rather by a limited number of dealers.

Defendant's evidence as to the value of the coat ranged in amount from $500 to $1000. Such values were determined by considering the age of the coat and the fact that the market value of fur coats are reduced to a certain extent each year, whether worn or kept in storage. Such testimony made an issue of fact for the jury and it is not within our province to say the verdict was excessive, even though we may think the evidence preponderates in favor of defendant. Believing there is substantial testimony from which the jury could find the market value to be $1300, we will not interfere with the verdict.

Defendant also complains that the court erred in prohibiting cross-examination of plaintiff with reference to her friendship for, and association with, men by the names of Fine, Cargotta and Rostisky, all having unsavory reputations. The general tenor of the questions was whether she knew these men and whether she "kept company" with them. She admitted knowing them but denied "keeping company" with them. Our attention is directed to a question and answer in the deposition of witness Phippen, a detective, which deposition the court excluded. The question: "Whom did the plaintiff say her friends were? A. Well, I can tell you the name here, wait a minute. She told me that Willis Rostisky was a friend of hers, and he was killed at St. Joe in a gambling game; and Charlie Gargotta was her friend, and also Fine." It is conceded the questions had no direct bearing on the merits of the case but were asked for the purpose of affecting plaintiff's credibility as a witness. The extent to which the cross-examination of a witness on collateral matters may be permitted, rests largely within the discretion of the trial court. It should not be too limited but must be kept within proper bounds. [State v. Crow (Mo.), 84 S. W. (2d) 926, 929.] Unless that discretion has been abused and the defendant prejudiced thereby, a reversal of the case is not justified.

Under the pleadings and the trial theory, there was just one issue in the case, i. e., the value of the fur coat. There was no contention that the coat had not been stolen or that the robbery was a fake. Defendant cites the cases of Taylor v. Connecticut Fire Insurance Company, 285 S. W. 1012, and Asadorian Rug Company v. Chandeysson, 144 S. W. (2d) 199, 1. c. 202. In the Taylor case the question asked was concerning a specific act which was, within itself, immoral, and while the court held the evidence was improperly excluded, nevertheless the case seems to have been reversed and remanded because of error in an instruction. In the Asadorian Rug Company case the court permitted cross-examination of defendant concerning "a specific

334

act affecting his credibility." What this specific act was, is not disclosed and the only point made about it by plaintiff was "that a witness may not be impeached by proof of specific acts." The court properly held that rule did not apply where specific acts are sought to be be elicited on cross-examination. In the present case the inquiry concerned the acquaintance and friendship of plaintiff for three certain men without any contention or implication of any specific act of improper association. The questions may have created a "suspicion" in the jury's mind but lawsuits should not be tried and decided on "suspicion." We do not believe the court abused its discretion in excluding such testimony.

Finding no reversible error, it follows that the judgment should be affirmed. It is so ordered. *Bland, J.,* concurs.